FILED

2013 Jun-04  AM 10:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MARLENE EADS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-11-S-3766-NE** |
| | ) | |
| **DECATUR UTILITIES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Marlene Eads, alleges that defendant, Decatur Utilities, terminated her employment on the basis of her age and disability in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"), and the Americans with Disabilities Act of 1990, 42 U.S.C. § 1201 *et seq.* ("ADA").[1] The action is before the court on defendant's motion for summary judgment.[2] Upon consideration, the court will grant the motion.

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 indicates that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

---

[1] Doc. no. 1 (Complaint) ¶ 1.

[2] *See* doc. no. 14 (Motion for Summary Judgment).

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration supplied).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> [However,] [t]he mere existence of *some* factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal citations omitted) (alterations and emphasis suppled).

## II. SUMMARY OF FACTS

Defendant, Decatur Utilities, is an entity that is governed by the Municipal Utilities Board of Decatur, Morgan County, Alabama.[3]   The entity provides

---

[3] Doc. no. 16-1 (Declaration of Ray Hardin) ¶ 1.

2

electricity, natural gas, water, and wastewater services to the Decatur community.[4]

Plaintiff, Marlene Eads, was employed by defendant as a Work Order Coordinator in

the Electric Construction Group for ten years, between her hiring in February of 2000

and her termination on August 13, 2010.[5]   On the date of her termination, plaintiff

was 60 years of age.[6]   She also had undergone surgery to remove her thyroid gland,

and suffered from congestive heart failure, fibromyalgia, and arthritis.[7]

In her capacity as a Work Order Coordinator, plaintiff took direction from her

immediate supervisor, Electric Field Superintendent Steven Williams.[8]   Williams

reported to Electric Manager Glenn Boyles, who, in turn, reported to General

Manager Ray Hardin.[9]   Despite the fact that plaintiff and Hardin were a mere three

steps removed on the chain of command, plaintiff did not work directly with the

General Manager, and, in fact, "never had any communication with Mr. Hardin."[10]

The series of events that culminated in plaintiff's termination began with her act of

---

[4] *Id.*

[5] Doc. no. 16-2 (Deposition of Marlene Eads), at 7-8; *id.*, Defendant's Exhibit 2 (Job Description), at D00015; doc. no. 16-3 (Deposition of Ray Hardin), Exhibit 3 (E-Mail Regarding Plaintiff's Termination Decision).

[6] Doc. no. 16-2 (Deposition of Marlene Eads), at 22-23.  Plaintiff was born on December 4, 1949.  *Id.*

[7] *Id.* at 29-30.

[8] *Id.* at 10, 15; doc. no. 16-3 (Deposition of Ray Hardin), at 38.

[9] Doc. no. 16-3 (Deposition of Ray Hardin), at 38.

[10] Doc. no. 16-2 (Deposition of Marlene Eads), at 44; *see also* doc. no. 16-1 (Declaration of Ray Hardin) ¶ 6; doc. no. 16-3 (Deposition of Ray Hardin), at 38.

accessing the General Manager's electronic calendar without his knowledge.

A.    **Plaintiff's Job Description**

Plaintiff argues that she accessed the General Manager's calendar to fulfill the duties of her position as a Work Order Coordinator.[11]  The written job description for plaintiff's position contains the following "essential duties and responsibilities":

• Coordinates distribution of work order documents.

• Contacts One Call center for locates.

• Enters field work order data, estimated and actual man-hours, start and complete dates.

• Assists warehouse supervisor [to] reconcile work order materials.

• Responds to customer inquiries about work progress, scheduling status, service interruptions, etc.

• Works with engineers and warehouse personnel on work units and materials.

• Coordinates switching requests with General Construction Supervisor and submits request forms to Dispatch Center.

• Maintains database for Apprentice/Crewman work and training hours.

• Maintains database for Electric Maintenance and Inspections.

• Coordinates vehicle maintenance schedules, schedules truck repairs and enters vehicle inspection data.

---

[11] Doc. no. 16-2 (Deposition of Marlene Eads), at 38-39.

4

• Prepares various reports as requested by Superintendent.

• Helps maintain and assemble system maps by verifying field corrections and relaying data to CAD.[12]

The written job description for the position of Work Order Coordinator also contains the caveat that "[o]ther duties may be assigned to [e]nsure excellence in customer service."[13]

Plaintiff disputes the accuracy of the job description on the grounds that she also performed a variety of other duties.[14]  Before offering plaintiff the position of Work Order Coordinator in February of 2000, plaintiff's former supervisor, Stan Keenum, allegedly inquired whether plaintiff was willing to "do what[ever she] was asked to do, from mopping a floor to doing [her] job."[15]  Plaintiff testified that she entered work order data, called in "locates" to identify safe areas to dig, and assisted in balancing the inventory of work materials following the completion of jobs.[16]  If work left a road impassable, plaintiff informed the Decatur city authorities of the need to patch it, ordered gravel to fill in dig sites, and occasionally delivered materials to

---

[12] Doc. no. 16-2 (Deposition of Marlene Eads), Defendant's Exhibit 2 (Job Description), at D00015 (alteration supplied).  "CAD" is presumably an acronym for "Computer-Aided Drafting."

[13] *Id.* (alterations supplied).

[14] *Id.* at 20.

[15] *Id.* (alteration supplied).

[16] *Id.* at 8-12.

those sites.[17]  She also performed a number of menial tasks, including buzzing visitors

through a security gate on defendant's premises, delivering mail to the post office,

assisting with retirement parties, making coffee, and cleaning.[18]

## B.    Plaintiff's Act of Accessing the Electronic Calendars of Various Supervisors

At the time when plaintiff accessed General Manager Ray Hardin's electronic

calendar without his knowledge, a Decatur Utilities employee could attempt to access

a coworker's electronic calendar by logging onto defendant's computer network,

opening the Microsoft Outlook program, and selecting the coworker's name from a

list.[19]  If the employee had clearance to access that person's electronic calendar, she

could open the calendar by clicking on the name without entering a password.[20]  The

employee did not need to "hack" into the calendar or override security measures.[21]

During the course of her employment with defendant, plaintiff accessed the

electronic calendars of various coworkers, both within and outside the Electric

Construction Group.[22]  Those coworkers included General Manager Ray Hardin,

---

[17] *Id.* at 13-20.

[18] *Id.* at 8, 19-21, 40.

[19] Doc. no. 16-3 (Deposition of Ray Hardin), at 10.

[20] Doc. no. 16-2 (Deposition of Marlene Eads), at 38; doc. no. 16-3 (Deposition of Ray Hardin), at 10, 12-13, 21.

[21] Doc. no. 16-3 (Deposition of Ray Hardin), at 10.

[22] Doc. no. 16-2 (Deposition of Marlene Eads), at 39, 40, 42.

6

Human Resources Administrator Shannon Kirby, Electric Manager Glenn Boyles, Electric Field Superintendent Steven Williams, Lead Lineman Joel Herring, Meter Shop Supervisor Ken Lindsey, Warehouse Supervisor Randy Dunn, and Purchasing Agent Mickey Jones.[23]

Plaintiff became aware of her ability to access General Manager Ray Hardin's electronic calendar in February of 2010.[24]  Once she made that discovery, plaintiff began checking the calendar on a daily basis.[25]  When asked her reasons for accessing that calendar, plaintiff asserted that her supervisor, Electric Field Superintendent Steven Williams, instructed her to look for meetings that conflicted with the activities of the Electric Construction Group.[26]  Plaintiff also testified that she told Williams that she was accessing the electronic calender of various coworkers.[27]  More specifically, plaintiff stated:

> I was looking at the managers[' calendars] to see if there was meetings or anything scheduled that would interfere with our [presumably, the Electric Construction Group's] work schedule.  I did a report every morning that would state where the [field] crews were for the day.  I put the weather report on it and if there was any meetings or anything that was — might interfere.  And we also had a calendar like a dry erase board in the lead linemen's offices that had big squares for the day, and

---

[23] Doc. no. 16-2 (Deposition of Marlene Eads), at 39, 40, 42.

[24] *Id.* at 38; *see also* doc. no. 16-3 (Deposition of Ray Hardin), at 10.

[25] Doc. no. 16-2 (Deposition of Marlene Eads), at 39.

[26] *Id.* at 41.

[27] *Id.*

I put meetings on that if there was any.[28]

Even so, plaintiff admitted that the employees on the field crews did not attend meetings with General Manager Ray Hardin.[29] She maintained, nevertheless, that her supervisors attended meetings with Hardin, and that those meetings did not "necessarily" appear on her supervisors' calendars.[30] The implication of plaintiff's testimony is that, although Hardin was not a part of the Electric Construction Group, she needed to access Hardin's calendar in order to determine whether the meetings attended by her supervisors and Hardin conflicted with the Group's work.

It is undisputed that General Manager Ray Hardin did not tell plaintiff that she could access his electronic calendar for any reason.[31]   Hardin alleged that he "assumed that [his] calendar was secure and not accessible to other employees."[32] Even so, plaintiff testified that Lead Lineman David Evans and Warehouse Clerk Linda Sanders each told plaintiff that they also had accessed Hardin's electronic calendar.[33]  Plaintiff was not aware of either employee's reasons for doing so.[34]

The record is not clear on whether plaintiff was told that she could access the

---

[28] *Id.* at 38 (alterations supplied).

[29] *Id.* at 39.

[30] *Id.*

[31] Doc. no. 16-1 (Declaration of Ray Hardin) ¶ 6.

[32] *Id.* (alteration supplied); *see also* doc. no. 16-3 (Deposition of Ray Hardin), at 11, 20.

[33] Doc. no. 16-2 (Deposition of Marlene Eads), at 41-42.

[34] *Id.*

electronic calendars of other coworkers, including Human Resources Administrator Shannon Kirby, Electric Manager Glenn Boyles, Electric Field Superintendent Steven Williams, Lead Lineman Joel Herring, Meter Shop Supervisor Ken Lindsey, Warehouse Supervisor Randy Dunn, and Purchasing Agent Mickey Jones. Plaintiff alleged only that she received access to Kirby's calendar from Kirby's predecessor, Beth Wirey, and that "when Beth had [the calendar,] she put meetings on there for us to know when there was meetings."[35] Plaintiff did not state how she received access to the electronic calendars of Boyles, Williams, Herring, Lindsey, Dunn, and Jones.

## C.   The Calendar Entry Regarding the Decision Not to Promote Jonathan Aldridge

By August of 2010, plaintiff was working in defendant's electric warehouse with Jonathan Aldridge, a male coworker in his late 20s who had submitted an application for the position of Measurement Technician.[36] During her review of General Manager Ray Hardin's calendar on August 11, 2010, plaintiff noticed a meeting request from Human Resources Manager Christy Lamb.[37]

Lamb had proposed a meeting with Hardin and Manager Jimmy Evans in order

---

[35] *Id.* at 42-43 (alteration supplied).

[36] *Id.* at 14, 44; doc. no. 16-3 (Deposition of Ray Hardin), at 45.

[37] Doc. no. 16-2 (Deposition of Marlene Eads), at 44; doc. no. 16-3 (Deposition of Ray Hardin), at 11-12, 15-16, 45; *id.*, Plaintiff's Exhibit 2 (Memorandum in Plaintiff's Personnel File).

to discuss a hiring recommendation for the position of Measurement Technician.[38] The request contained the names of the top candidates, their current pay, and their interviewers' recommendations.[39]  It revealed that Jonathan Aldridge had not been selected for the position.[40]  Plaintiff was not involved in the hiring decision.[41]

After reading the request, plaintiff informed Jonathan Aldridge that she had seen an entry on General Manager Ray Hardin's electronic calendar regarding the Measurement Technician position.[42]  Plaintiff then told Aldridge how to access the calendar from his computer, stood behind Aldridge's desk on the warehouse dock, and watched as Aldridge followed her oral instructions.[43]

Jonathan Aldridge immediately sent a text message to Thomas Russell, an employee of one of defendant's service centers who also had applied for the Measurement Technician position.[44]  The text message stated:  "[W]ith you having that card already and [J]ames putting in for it I knew I was screwed unless they have changed their minds b/c what I saw was a recommendation to [General Manager R]ay

---

[38] Doc. no. 16-3 (Deposition of Ray Hardin), Plaintiff's Exhibit 2 (Memorandum in Plaintiff's Personnel File).

[39] Id.

[40] Doc. no. 16-2 (Deposition of Marlene Eads), at 47, 49.

[41] Id.

[42] Id. at 45-47.

[43] Id. at 45-47.

[44] Id. at 48; doc. no. 16-3 (Deposition of Ray Hardin), Plaintiff's Exhibit 2 (Memorandum in Plaintiff's Personnel File).

[Hardin] with just our 3 names on it[,] mine being 3."[45]

## D.   The Investigation of Jonathan Aldridge's Knowledge of Defendant's Hiring Decision

At 7:30 a.m. on August 11, 2010 (the day that plaintiff shared the calendar entry with Jonathan Aldridge), two employees named Glenn Hill and Lonnie Dunn informed Human Resources Manager Christy Lamb of the text message sent by Jonathan Aldridge to Thomas Russell.[46]   Lamb then met with Manager Jimmy Evans to discuss the fact that an employee had accessed and distributed confidential information about an upcoming hiring decision.[47]   Evans called General Manager Ray Hardin, who was out of town, to inform him about the matter.[48]

Lamb contacted Aldridge at 10:45 a.m. and asked him to come to her office for a meeting with her and Evans.[49]   When questioned on the source of his knowledge, Aldridge stated that plaintiff came to his office early that morning and "said she had

---

[45] Doc. no. 16-3 (Deposition of Ray Hardin), Plaintiff's Exhibit 2 (Memorandum in Plaintiff's Personnel File) (alterations supplied).

[46] *Id.*   The job title of Glenn Hill is not clear from the record.   *Lonnie* Dunn may be a nickname for, or a relative of, Warehouse Supervisor *Randy* Dunn.   *See* doc. no. 16-2 (Deposition of Marlene Eads), at 17 (discussing *Randy* Dunn); doc. no. 16-3 (Deposition of Ray Hardin), at 25 (same).

[47] Doc. no. 16-3 (Deposition of Ray Hardin), Plaintiff's Exhibit 2 (Memorandum in Plaintiff's Personnel File).

[48] Doc. no. 16-3 (Deposition of Ray Hardin), at 13-14; *id.*, Plaintiff's Exhibit 2 (Memorandum in Plaintiff's Personnel File).

[49] Doc. no. 16-3 (Deposition of Ray Hardin), Plaintiff's Exhibit 2 (Memorandum in Plaintiff's Personnel File).

11

some information that he might want to see."[50]  Plaintiff then "told him that he could access Ray Hardin's personal [O]utlook calendar[,] and showed him how to access it on his computer."[51]   Aldridge was sent home at 12:00 p.m. pending further investigation and discussion with Hardin and Electric Manager Glenn Boyles.[52]

Immediately thereafter, plaintiff's supervisor, Electric Field Superintendent Steven Williams, asked plaintiff to come to the Human Resources office for a meeting with Human Resources Manager Christy Lamb and Manager Jimmy Evans.[53] Plaintiff alleges that Lamb refused to permit plaintiff to invite Williams to attend the meeting.[54]  In any event, plaintiff admitted that she had accessed General Manager Ray Hardin's electronic calendar.[55]   According to the memorandum prepared by Lamb for inclusion in plaintiff's personnel file,

> [Plaintiff] stated that she accessed Ray Hardin's calendar frequently and started approximately six month ago when she discovered it was a "shared calendar" to her.  She said that she looked at it daily to see what was going on in the company.  She stated that she did not see anything wrong with her looking at it.  She admitted that when she read the measurement tech meeting information, she called Jonathon [Aldridge] and then went over to his office to show him how to access the calendar.  She also stated that she went down through the

---

[50] *Id.*

[51] *Id.* (alterations supplied).

[52] *Id.*

[53] Doc. no. 16-2 (Deposition of Marlene Eads), at 49.

[54] *Id.*

[55] *Id.*

names of other DU [*i.e.*, Decatur Utilities] employees/managers to see if she could view others, mentioned Jimmy Evans.  She said she did this routinely as part of her job as a Work Order Coordinator, although no one had asked her to do this.  Based on the information that [plaintiff] admitted on sharing confidential information to another employees, she was sent home at approximately 1:00 pm for the remainder of the week.[56]

Later that afternoon, Human Resources Manager Christy Lamb described the matter to Electric Manager Glenn Boyles, and Manager Jimmy Evans discussed the matter with General Manager Ray Hardin.[57]  An unidentified employee reviewed plaintiff's Outlook calendar settings and discovered that, in addition to accessing Hardin's calendar, she also had opened the calendar of Human Resources Administrator Shannon Kirby.[58]  Hardin sought "input" from plaintiff's supervisor, Electric Field Superintendent Steven Williams, and asked whether Williams was aware that plaintiff was accessing Hardin's calendar.[59]  Hardin could not recall Williams's response to that question during his deposition.[60]

Upon General Manager Ray Hardin's return to the area, he and Human Resources Manager Christy Lamb scheduled a meeting with plaintiff for 1:00 p.m.

---

[56] Doc. no. 16-3 (Deposition of Ray Hardin), Plaintiff's Exhibit 2 (Memorandum in Plaintiff's Personnel File) (alterations supplied).

[57] *Id.*

[58] *Id.*

[59] Doc. no. 16-3 (Deposition of Ray Hardin), at 36; *id.*, Plaintiff's Exhibit 2 (Memorandum in Plaintiff's Personnel File).

[60] Doc. no. 16-3 (Deposition of Ray Hardin), at 36.

on August 13, 2010.[61]  Prior to attending the meeting, plaintiff called her supervisor, Electric Field Superintendent Steven Williams, and asked whether she could collect her belongings because she "thought she was going to be terminated on Monday."[62] Plaintiff was denied access to the building pending a decision regarding her continued employment.[63]  She attended the meeting with Hardin and Lamb in the company of an attorney, Allen Stoner.[64]  (Mr. Stoner is not representing plaintiff in this litigation.[65])

During the meeting, plaintiff confirmed that she had been accessing General Manager Ray Hardin's electronic calendar for the six previous months, that she had read an entry about a promotion to the Measurement Technician position, and that she had instructed Jonathan Aldridge, a candidate for the position, on how to access Hardin's calendar in order to review the information contained therein.[66]  When Hardin asked plaintiff *why* she had accessed his calendar, plaintiff claimed that she had done so as part of her job.[67]  However, she could not explain *how* the General

---

[61] Doc. no. 16-3 (Deposition of Ray Hardin), Plaintiff's Exhibit 2 (Memorandum in Plaintiff's Personnel File).

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *See* docket sheet.  Plaintiff was represented by Gregg L. Smith until October 5, 2012, and she presently is represented by Brian M. White of White & Oakes LLC.

[66] Doc. no. 16-1 (Declaration of Ray Hardin) ¶ 4.

[67] *Id.*

Manager's calendar related to her duties as Work Order Coordinator in the Electric Construction Group.[68]

General Manager Ray Hardin explained to plaintiff that accessing his calendar without permission was equivalent to rifling through his desk drawers.[69] Plaintiff did not apologize or show remorse for her actions, and, in fact, displayed "no recognition that what we [presumably, Hardin and Lamb] had determined was wrong was inappropriate at all."[70] Even so, Hardin would not testify that if plaintiff had apologized or shown remorse for her actions, she would have kept her job.[71]

General Manager Ray Hardin also interviewed Jonathan Aldridge about the incident.[72] During the meeting, Aldridge confirmed that plaintiff had shown him how to access Hardin's calendar.[73] Aldridge also admitted that he had accessed Hardin's calendar on that occasion only.[74] Aldridge, unlike plaintiff, acknowledged that his actions were inappropriate, and promised to refrain from accessing Hardin's calendar

---

[68] *Id.* ¶¶ 4, 7; doc. no. 16-3 (Deposition of Ray Hardin), at 20, 50.

[69] Doc. no. 16-1 (Declaration of Ray Hardin) ¶ 6; doc. no. 16-2 (Deposition of Marlene Eads), at 51.

[70] Doc. no. 16-3 (Deposition of Ray Hardin), at 46 (alteration supplied); *see also* doc. no. 16-1 (Declaration of Ray Hardin) ¶ 4; doc. no. 16-3 (Deposition of Ray Hardin), Plaintiff's Exhibit 2 (Memorandum in Plaintiff's Personnel File).

[71] Doc. no. 16-3 (Deposition of Ray Hardin), at 46.

[72] Doc. no. 16-1 (Declaration of Ray Hardin) ¶ 5.

[73] *Id.*

[74] *Id.*

15

without permission.[75]

General Manager Ray Hardin's investigation left several questions unanswered, including:  whether plaintiff had permission to access the electronic calendars belonging to Human Resources Administrator Shannon Kirby and certain other coworkers;[76] whether plaintiff had previously been told that reviewing coworkers' electronic calendars *was* part of her job;[77] whether plaintiff had previously been told that reviewing coworkers' electronic calendars *was not* part of her job;[78] whether other employees accessed Hardin's calendar without his knowledge;[79] and whether other employees accessed the calendars of coworkers outside their work groups.[80]

## E.    The Discipline of Plaintiff and Jonathan Aldridge

Upon concluding his investigation, General Manager Ray Hardin "[could not] conceive of any reason [why plaintiff] would need to access [his] calendar as part of her job."[81]  Hardin reasoned that he "[did] not work directly with [plaintiff] and, prior to this incident, had only met her in passing.  [Hardin and plaintiff did] not even work

---

[75] *Id.*

[76] Doc. no. 16-3 (Deposition of Ray Hardin), at 24-25.

[77] *Id.* at 47-48.

[78] *Id.* at 20-21.

[79] *Id.* at 28.

[80] *Id.*

[81] Doc. no. 16-1 (Declaration of Ray Hardin) ¶ 7 (alterations supplied).

16

in the same building."[82]

General Manager Ray Hardin made the decision to terminate plaintiff's employment on August 13, 2010.[83]  He announced the decision to Human Resources Manager Christy Lamb in an e-mail sent at 3:49 p.m., less than four hours after his meeting with plaintiff.[84]  Hardin testified that the "calendar incident" was the only reason for plaintiff's termination.[85]  He considered termination warranted because:

> [plaintiff] had repeatedly accessed [his] and other managers' Outlook calendars, though [he] had never given her permission to do so and though it was not necessary for her to do so to perform her job; she shared information about a pending personnel decision with an affected employee; and she would not even acknowledge that her conduct was inappropriate.[86]

General Manager Ray Hardin also concluded that Jonathan Aldridge had accessed his electronic calendar and shared the information therein with another employee.[87]  Hardin did not, however, terminate Aldridge's employment, allegedly because Aldridge only accessed the calendar on one occasion, acknowledged that his

---

[82] *Id.* (alterations supplied); *see also* doc. no. 16-3 (Deposition of Ray Hardin), at 11-18.

[83] Doc. no. 16-3 (Deposition of Ray Hardin), at 21-22; *id.*, Plaintiff's Exhibit 3 (Termination E-Mail).

[84] Doc. no. 16-3 (Deposition of Ray Hardin), at 21-22; *id.*, Plaintiff's Exhibit 3 (Termination E-Mail).

[85] Doc. no. 16-3 (Deposition of Ray Hardin), at 7.

[86] Doc. no. 16-1 (Declaration of Ray Hardin) ¶ 8 (alterations supplied); *see also* doc. no. 16-3 (Deposition of Ray Hardin), at 21-22, 31, 34-35.

[87] Doc. no. 16-1 (Declaration of Ray Hardin) ¶ 9.

conduct was inappropriate, and promised to refrain from accessing the calendar without permission.[88]   Hardin instead subjected Jonathan Aldridge to less severe forms of discipline, which included a suspension without pay, a written warning regarding the incident, ineligibility for a raise during the next review cycle, and ineligibility for transfer or promotion for a period of one year.[89]

### F.   The Implementation of Security Measures to Protect Calendars from Unauthorized Access

At the time of plaintiff's termination, General Manager Ray Hardin had no reason to suspect that certain employees could access the electronic calendars of their coworkers without permission.[90]   Accordingly, Hardin directed Human Resources Manager Christy Lamb to dispatch Information Technology Coordinator John Kuhlman to investigate the extent to which "there had been breaches of other calendars around the company."[91]

Kuhlman informed Hardin of the results of his review of plaintiff's e-mail account and electronic calendar access in an e-mail dated August 16, 2010, three days *after* Hardin made the decision to terminate plaintiff's employment.[92]   To explain his

---

[88] *Id.*; *see also* doc. no. 16-3 (Deposition of Ray Hardin), at 44-46.

[89] Doc. no. 16-1 (Declaration of Ray Hardin) ¶ 9; doc. no. 16-3 (Deposition of Ray Hardin), at 44-45.

[90] Doc. no. 16-1 (Declaration of Ray Hardin) ¶ 11.

[91] Doc. no. 16-3 (Deposition of Ray Hardin), at 33.

[92] *Id.* at 32, 34; *id.*, Plaintiff's Exhibit 4 (Kuhlman E-Mail).

failure to await the results of Kuhlman's investigation, Hardin testified that "there was enough information known about the situation to make th[e termination] decision . . . . [W]e really just wanted to find out how extensive the situation had become."[93]

Information Technology Coordinator John Kuhlman discovered that plaintiff was able to access the calendars of General Manager Ray Hardin and various other coworkers because the calendars had mistakenly been designated as "open" and could, therefore, be viewed by any employee.[94]  Since the incident, defendant has implemented security measures to protect calendars from unauthorized access.[95]

## G.   The Role of Plaintiff's Age and Disability

At the time of plaintiff's termination, General Manager Ray Hardin was not aware of plaintiff's medical conditions, and had not commented on any such conditions.[96]  In fact, none of defendant's employees had remarked negatively on plaintiff's conditions.[97]  Hardin had also not commented negatively on plaintiff's age.[98]

After General Manager Ray Hardin terminated plaintiff's employment, five

---

[93] Doc. no. 16-3 (Deposition of Ray Hardin), at 34 (alterations supplied).

[94] *Id.* at 27.

[95] *Id.* at 27, 29.

[96] Doc. no. 16-1 (Declaration of Ray Hardin) ¶ 10; doc. no. 16-2 (Deposition of Marlene Eads), at 71.

[97] Doc. no. 16-2 (Deposition of Marlene Eads), at 62, 72.

[98] *Id.* at 70-71.

19

persons applied to fill her position.[99]  Defendant first offered the job to Glenda Ratliff, age 58 (two years younger than plaintiff), who declined the position.[100]  Defendant then offered the job to Sandra Stephenson, age 49 (eleven years younger than plaintiff), who accepted the position.[101]

### III. DISCUSSION

Plaintiff "does not oppose summary judgment on the ADA claim."[102]  Accordingly, this court will grant summary judgment on that claim.

Defendant also requests summary judgment on plaintiff's ADEA claim.[103]  The ADEA makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  The ADEA protects individuals who "are at least 40 years of age but less than 70 years of age."  29 U.S.C. § 621(a).

Plaintiff presents no direct evidence of age discrimination.  She must therefore satisfy the burden-shifting framework for claims provable through circumstantial evidence that was promulgated by the Supreme Court in a trilogy of decisions,

---

[99] Doc. no. 16-1 (Declaration of Ray Hardin) ¶ 13.

[100] *Id.*

[101] *Id.*

[102] Doc. no. 17 (Response to Motion for Summary Judgment), at 2.

[103] Doc. no. 14 (Motion for Summary Judgment), at 9.

20

beginning with *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), then elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), and finally elucidated in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).[104]

The analytical framework developed by that trilogy has three steps, the goal of which is that of "progressively . . . sharpen[ing] the inquiry into the elusive factual question of intentional discrimination." *Hicks*, 509 U.S. at 506 (quoting *Burdine*, 450 U.S. at 255 n.8). The plaintiff bears the initial burden of establishing a *prima facie* case of intent to discriminate. *McDonnell Douglas*, 411 U.S. at 802. The establishment of a *prima facie* case "creates a presumption that the employer unlawfully discriminated against the employee." *Burdine*, 450 U.S. at 254.

The effect of the presumption of discrimination is to shift to the employer the burden of producing, but not proving, some legitimate, nondiscriminatory reason for the contested employment action. *See McDonnell Douglas*, 411 U.S. at 802. To satisfy the burden of production, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the

---

[104] Although those cases involved Title VII discrimination claims, a variant of the analysis also applies to ADEA discrimination claims. *See Mitchell v. Worldwide Underwriters Insurance Co.*, 967 F.2d 565, 566 (11th Cir. 1992); *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1500 (11th Cir. 1991).

plaintiff." *Burdine*, 450 U.S. at 254-55 (citation and footnote omitted).

"If the defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted," *id.* at 255, and "drops from the case." *Id.* at 255 n.10. At the third level of analysis, "the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

> [T]his circuit's post-*Hicks* decisions uniformly hold that once a plaintiff has established a *prima facie* case and has put on sufficient evidence to allow a factfinder to disbelieve an employer's proffered explanation for its actions, that alone is enough to preclude entry of judgment as a matter of law.

*Id.* at 1532 (alteration supplied).

## A.   Plaintiff's *Prima Facie* Case

To make out a *prima facie* case of age discrimination in violation of the ADEA, the plaintiff must prove: (1) that she was a member of the class of persons protected by the Act, that is, individuals between the ages of 40 and 70; (2) that she was qualified to perform the duties of her position; (3) that she was discharged; and (4) that she was replaced by a substantially younger person.[105]  *See, e.g., Reeves v.*

---

[105] The plaintiff is not required to establish that she was replaced by someone less than 40 years of age, but only by someone "substantially younger." *O'Connor v. Consolidated Coin*

*Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000); *Bogle v. Orange County Board of County Commissioners*, 162 F.3d 653, 656-57 (11th Cir. 1998); *Turlington v. Atlanta Gas Light* Co., 135 F.3d 1428, 1432 (11th Cir. 1998); *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207-08 (11th Cir. 1997).

Alternatively, the plaintiff "may still satisfy the last prong of the prima facie case requirement by identifying similarly situated comparators outside of his protected class who were treated more favorably." *Horn v. UPS*, 433 F. App'x 788, 792 (11th Cir. 2011) (citing *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185-86 (11th Cir. 1984)). Plaintiff attempts to make out a *prima facie* case of age discrimination using the *Nix*/*Horn* method: *i.e.*, "by showing that she was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class."[106]

---

*Caterers Corp.*, 517 U.S. 308, 313 (1996). This Circuit has interpreted the requirement that the plaintiff's replacement be "substantially younger" as follows:

> Unlike race and sex discrimination cases, the plaintiff in an age discrimination case need not necessarily prove that his replacement was outside the protected class, that is, under forty years of age. The plaintiff in an age discrimination case may establish a prima facie case merely by establishing that his replacement was younger than he, provided that the discrepancy between the ages, along with any other relevant evidence, is sufficient that a fact finder could reasonably infer age discrimination.

*Corbin v. Southerland International Trucks*, 25 F.3d 1545, 1549 (11th Cir. 1994).

[106] *See* doc. no. 17 (Response to Motion for Summary Judgment), at 20-21.

The only "similarly situated employee" identified by plaintiff is Jonathan Aldridge.[107]

Defendant does not dispute (1) that plaintiff was 60 years old at the time of her termination, (2) that she was qualified to perform the duties of her position, and (3) that she was discharged.  Defendant *does* dispute that plaintiff and Aldridge were "similarly situated."[108]  Defendant notes that plaintiff accessed the electronic calendar of General Manager Ray Hardin on a daily basis over a period of six months,[109] but that Aldridge only did so on one occasion, and only at the urging and instruction of plaintiff.[110]  Further, defendant observes that plaintiff did not apologize or show remorse for her actions,[111] but that Aldridge acknowledged that his actions were inappropriate, and promised to refrain from accessing Hardin's calendar without permission.[112]

This Circuit has explained the "similarly situated" requirement as follows:

> "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer*

---

[107] *Id.* at 21.

[108] Doc. no. 15 (Motion for Summary Judgment), at 10.

[109] Doc. no. 16-2 (Deposition of Marlene Eads), at 39.

[110] Doc. no. 16-1 (Declaration of Ray Hardin) ¶ 5

[111] Doc. no. 16-3 (Deposition of Ray Hardin), at 46 (alteration supplied); *see also* doc. no. 16-1 (Declaration of Ray Hardin) ¶ 4; doc. no. 16-3 (Deposition of Ray Hardin), Plaintiff's Exhibit 2 (Memorandum in Plaintiff's Personnel File).

[112] Doc. no. 16-1 (Declaration of Ray Hardin) ¶ 5.

*Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir.), opinion modified by 151 F.3d 1321 (1998) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).  "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed."  *Id*. (internal quotations and citations omitted).  *We require that the quantity and quality of the comparator's misconduct be nearly identical* to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.  *See Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be *fair congeners*. In other words, apples should be compared to apples.").

*Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999) (emphasis supplied).

Other circuits have recognized "the soundness of treating employees who admit error and indicate a motivation to avoid it in [the] future differently than those who do not."  *Medlock v. UPS, Inc.*, 608 F.3d 1185, 1192 (10th Cir. 2010) (alteration supplied) (citing *Salguero v. City of Clovis*, 366 F.3d 1168, 1177 (10th Cir. 2004); *Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220, 1233 (10th Cir. 2000)).  The Eleventh Circuit has likewise recognized that employees' reactions to concerns regarding their performance may affect whether those employees are "similarly situated."  *See Riley v. Emory University*, 136 F. App'x 264, 267 (11th Cir. 2005) (holding that a plaintiff who "refused to coordinate a newsletter, but then agreed to write an article after repeated requests" was not similarly situated to a coworker who "apologized for her refusal and ensured that an article was written").

This Circuit has also recognized that principle in the context of educational discrimination suits. *See Carr v. Board of Regents of the University System*, 249 F. App'x 146, 150 (11th Cir. 2007) (holding that a plaintiff who "did not write an apology or return the money she received" was not similarly situated to another student who "wrote an apology, and returned the money").

The facts that Jonathan Aldridge only accessed the electronic calendar of General Manager Ray Hardin on one occasion, that he acknowledged that his actions were inappropriate, and that he promised to change his behavior are compelling evidence that plaintiff and Aldridge were not "similarly situated." Thus, this action could be resolved in favor of defendant on that basis alone. Even so, this court has assumed for the sake of the following discussion that plaintiff and Aldridge were "similarly situated," and that plaintiff has established her *prima facie* case. If that were to be assumed, defendant then would bear the burden of producing, but not proving, some legitimate, nondiscriminatory reason for the contested employment action. *See McDonnell Douglas*, 411 U.S. at 802.

**B.     Defendant's Allegedly Legitimate, Non-Discriminatory Reasons**

Defendant has identified three allegedly legitimate, non-discriminatory reasons for terminating plaintiff's employment: *i.e.*, the fact that plaintiff

repeatedly   accessed   [General   Manager   Ray   Hardin's]   and   other

26

managers' Outlook calendars, though [Hardin] had never given her permission to do so and though it was not necessary for her to do so to perform her job; she shared information about a pending personnel decision with an affected employee; and she would not even acknowledge that her conduct was inappropriate.[113]

Therefore, defendant has carried its burden of production. *See McDonnell Douglas*, 411 U.S. at 802.

## C.    Pretext

In addressing an argument that an employer's allegedly legitimate, non-discriminatory reason for an adverse employment action was pretextual, the Eleventh Circuit admonished that:

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.  *See Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1341 (11th Cir.2000) (Title VII case) ("It is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated."); *Combs*, 106 F.3d at 1541-43.  We have recognized previously and we reiterate today that:
>
> > federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere.  Rather

---

[113] Doc. no. 16-1 (Declaration of Ray Hardin) ¶ 8 (alterations supplied); *see also* doc. no. 16-3 (Deposition of Ray Hardin), at 21-22, 31, 34-35.

our inquiry is limited to whether the employer gave an honest explanation of its behavior."

*Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991) (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988) (citations omitted)); *see also Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984) (An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."); *Abel v. Dubberly*, 210 F.3d 1334, 1339 n. 5 (11th Cir.2000). We "do not … second-guess the business judgment of employers." *Combs*, 106 F.3d at 1543; *accord Alexander*, 207 F.3d at 1339, 1341; *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir.1999) ("We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. We are not in the business of adjudging whether employment decisions are prudent or fair." (internal citation omitted)).

*Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (footnote omitted).

Defendant's first allegedly legitimate reason for terminating plaintiff's employment is the fact that she "repeatedly accessed [General Manager Ray Hardin's] and other managers' Outlook calendars, though [Hardin] had never given her permission to do so and though it was not necessary for her to do so to perform her job."[114] It is undisputed that *General Manager Ray Hardin* did not tell plaintiff that she could access his electronic calendar for any reason.[115] Even so, plaintiff asserts

---

[114] Doc. no. 16-1 (Declaration of Ray Hardin) ¶ 8 (alterations supplied); *see also* doc. no. 16-3 (Deposition of Ray Hardin), at 21-22, 31, 34-35.

[115] Doc. no. 16-1 (Declaration of Ray Hardin) ¶ 6.

that her supervisor, *Electric Field Superintendent Steven Williams*, instructed her to look for meetings that conflicted with the activities of the Electric Construction Group.[116]  Plaintiff also testified that she told Williams that she was accessing the electronic calender of various coworkers.[117]  All of those calendars were designated as "open" and could, therefore, be viewed by any employee.[118]

Defendant's second allegedly legitimate reason for terminating plaintiff's employment is the fact that she "shared information about a pending personnel decision with an affected employee," Jonathan Aldridge.[119]  That information revealed not only the fact that Aldridge was not recommended for the position, but also the names and salaries of his competitors for the position.[120]  Plaintiff has admitted the truth of those allegations.[121]

Defendant's third allegedly legitimate reason for terminating plaintiff's employment is the fact that she refused to "acknowledge that her conduct was

---

[116] *Id.* at 41.

[117] *Id.*

[118] Doc. no. 16-3 (Deposition of Ray Hardin), at 27.

[119] Doc. no. 16-1 (Declaration of Ray Hardin) ¶ 8 (alterations supplied); *see also* doc. no. 16-3 (Deposition of Ray Hardin), at 21-22, 31, 34-35.

[120] Doc. no. 16-2 (Deposition of Marlene Eads), at 47, 49; doc. no. 16-3 (Deposition of Ray Hardin), Plaintiff's Exhibit 2 (Memorandum in Plaintiff's Personnel File).

[121] *See, e.g.,* doc. no. 17 (Response to Motion for Summary Judgment), at 3-4 (plaintiff's response to defendant's statement of undisputed facts).

inappropriate."[122] Plaintiff remained adamant in her refusal to apologize even after General Manager Ray Hardin explained his belief that accessing his calendar without permission was equivalent to rifling through his desk drawers.[123]   Plaintiff has admitted the truth of those allegations.[124]

This court holds that plaintiff has not proven that defendant's allegedly legitimate reasons for terminating her employment are pretextual, because those reasons are ones "that might motivate a reasonable employer" to take the challenged employment action.  *See Chapman*, 229 F.3d at 1030 (11th Cir. 2000).  Plaintiff's act of sharing information about an upcoming hiring decision with applicant Jonathan Aldridge showed poor judgment, because the information revealed not only the fact that Aldridge was not recommended for the position, but also the names and salaries of his competitors for the position.  Defendant understandably wished to withhold that information from Aldridge in order to protect the privacy of coworkers who also had applied for the position.

Even accepting plaintiff's argument that she accessed General Manager Ray Hardin's electronic calendar at the direction of her supervisor in order to look for

---

[122] Doc. no. 16-1 (Declaration of Ray Hardin) ¶ 8 (alterations supplied); *see also* doc. no. 16-3 (Deposition of Ray Hardin), at 21-22, 31, 34-35.

[123] Doc. no. 16-1 (Declaration of Ray Hardin) ¶ 6; doc. no. 16-2 (Deposition of Marlene Eads), at 51.

[124] *See, e.g.,* doc. no. 17 (Response to Motion for Summary Judgment), at 4 (plaintiff's response to defendant's statement of undisputed facts).

meetings that conflicted with her work group's activities, defendant was under no obligation to credit that argument as a reasonable explanation for plaintiff's decision to share the entry regarding the hiring decision with Jonathan Aldridge. *See Chapman*, 229 F.3d at 1030 (11th Cir. 2000) ("A plaintiff is not allowed to . . . substitute his business judgment for that of the employer."). Indeed, there is no indication that plaintiff shared the calendar's contents with Aldridge to resolve a scheduling conflict. Rather, plaintiff explained that she did so because she "saw something that applied to the job that [Aldridge] had applied for."[125]

Defendant was likewise not obligated to decide that "the issue of [plaintiff] not being satisfactorily contrite is not important" merely because *plaintiff* believed that she acted in accordance with the duties of her position.[126] *See Chapman*, 229 F.3d at 1030 (11th Cir. 2000) (observing that an "employee cannot succeed by simply quarreling with the wisdom" of an allegedly legitimate reason for an adverse employment action). Indeed, the refusal of an employee to apologize for her actions and express a willingness to change her behavior is regularly considered in disciplinary decisions. *See, e.g.*, *Arnold v. Tuskegee University*, 212 F. App'x 803, 806 (11th Cir. 2006) (affirming summary judgment on the Title VII claims of an

---

[125] Doc. no. 16-2 (Deposition of Marlene Eads), at 45 (alteration supplied).
[126] Doc. no. 17 (Response to Motion for Summary Judgment), at 25 (alteration supplied).

31

employee who refused to apologize); *Robinson v. AFA Service Corp.*, 870 F. Supp. 1077 (N.D. Ga. 1994) (granting summary judgment on the ADEA claims of an employee who stated that "she was not willing to change").  A district court from Georgia relied on *Robinson* to grant summary judgment on an age discrimination claim, and reasoned as follows:

> Defendant suggests that *Robinson v. AFA Service Corp.*, 870 F. Supp. 1077 (N.D. Ga. 1994) is instructive.  *See Robinson*, 870 F. Supp. at 1084 (granting summary judgment on plaintiff's age discrimination claim and retaliation claim in favor of employer based on finding that employer's reason for terminating plaintiff was not pretexutal).  In *Robinson*, the plaintiff filed an age discrimination case to which the defendant responded that plaintiff was not terminated because of her age, but because of her uncooperative behavior.  Her supervisor stated that he "became frustrated because she did not try to correct the problem or even admit that she needed to make changes."  *Robinson*, 870 F. Supp. at 1081.  When the plaintiff's supervisor tried to address certain problems with her, the plaintiff "was antagonistic and would not accept responsibility for her actions." *Id.*  The plaintiff's response, instead, was to point out the incompetence of her supervisor and others, attacking them personally.  *Id.*  Additionally, the plaintiff was confronting other employees about the reprimands she was receiving and upsetting them. *Id.*  Even after the plaintiff was placed on probation, she did not indicate a willingness to improve — in fact, she stated that "she was not willing to change" — and was terminated as a result.  *Id.*

> Tidwell-Williams, like the plaintiff in *Robinson*, was terminated in part because of what her employers believed was a failure on her part to indicate a willingness to improve.  After Chastain, her supervisor, confronted Tidwell-Williams with a list of errors she had made, the record shows that Tidwell-Williams responded by making numerous allegations of misconduct against her co-workers and by 'writing up' an error made by Chastain.  (Pl. Exhibits [53], Ex. S; Def. Exhibits [41],

Ex. U; Ex. V.)  Even after she was placed on probation, defendants perceived that plaintiff refused to acknowledge her mistakes or to make an effort to improve.

> *If Chastain and the other managers involved in the decision to force Tidwell-William's resignation misinterpreted plaintiff's indifference to the errors she made, or if the errors were wrongly attributed to Tidwell-Williams, or even if the management placed greater significance on those errors than another hospital would have placed on them, these things do not lead to a conclusion that the reasons offered for her dismissal were merely a pretext for discrimination.  The issue is whether the defendants genuinely believed that plaintiff committed a substantial number of errors and showed no interest in improving; the issue is not, as plaintiff argues, whether plaintiff actually committed the errors or actually exhibited an attitude that would be objectionable to others.  See Nix, 738 F.2d at 1186 (summary judgment granted in favor of employer, even though employer may have been mistaken about violation of work rule by plaintiff).*

*Tidwell-Williams v. Northwest Georgia Health System*, No. 1:97-CV-1726A-JEC, 1998 WL 1674745, *56-59 (N.D. Ga. Nov. 19, 1998) (emphasis supplied).  As in the *Tidwell-Williams* case, plaintiff has not rebutted the evidence that General Manager Ray Hardin "genuinely believed" that plaintiff showed poor judgment by sharing his electronic calendar with Jonathan Aldridge, and that she did not apologize or show remorse for her actions.[127]

## IV. CONCLUSION

For the reasons explained above, defendant's motion for summary judgment

---

[127] Doc. no. 16-3 (Deposition of Ray Hardin), at 46 (alteration supplied); *see also* doc. no. 16-1 (Declaration of Ray Hardin) ¶ 4; doc. no. 16-3 (Deposition of Ray Hardin), Plaintiff's Exhibit 2 (Memorandum in Plaintiff's Personnel File).

is GRANTED, and all of plaintiff's claims are dismissed with prejudice.  Costs are taxed to plaintiff.  The Clerk is directed to close this file.

     DONE this 4th day of June, 2013.

_____
United States District Judge